# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 14, 2016　　　　　　Decided June 14, 2016

No. 15-1149

MONICA J. LINDEEN, MONTANA STATE AUDITOR,
EX OFFICIO MONTANA COMMISSIONER OF SECURITIES AND
INSURANCE,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

Consolidated with 15-1150

———

On Petitions for Review of a Final Rule
of the Securities & Exchange Commission

———

*Robert E. Toone Jr.*, Assistant Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, argued the cause for the petitioner. *Maura Healy*, Attorney General, and *Jesse Laslovich* and *Nicholas J. Mazanec*, Special Assistant Montana Attorneys General, Office of the Montana State Auditor, were with him on brief. *Seth G. Schofield*, Assistant Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, entered an appearance.

*Anne-Valerie S. Mirko* was on brief for the *amicus curiae* North American Securities Administrators Association, Inc. in support of the petitioner.

*John Vail* was on brief for the *amici curiae* Current and Former Members of Congress in support of the petitioner.

*Jeffrey A. Berger*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for the respondent. *Michael A. Conley*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, *Randall W. Quinn*, Assistant General Counsel and *Benjamin M. Vetter*, Senior Counsel, were with him on brief.

*William M. Cunningham*, pro se, was on brief for the *amicus curiae* William M. Cunningham in support of the respondent.

*Ford C. Ladd* was on brief for the *amicus curiae* National Small Business United Association in support of the respondent.

Before: HENDERSON, *Circuit Judge*, and GINSBURG and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Pursuant to congressional mandate, the Securities and Exchange Commission (SEC or Commission) created a new class of securities offerings freed from federal-registration requirements so long as the issuers of these securities comply with certain investor safeguards. *See* Amendments for Small and Additional Issues Exemptions Under the Securities Act

(Regulation A[-Plus]),[1] 80 Fed. Reg. 21,806 (Apr. 20, 2015) (to be codified at 17 C.F.R. pts. 200, 230, 232, 239, 240, 249, & 260). The SEC also provided that anyone buying a certain subset of the securities will be considered a "qualified purchaser." *Id.* at 21,809, 21,858. In doing so, the SEC preempted all state registration and qualification requirements for the subset based on the Securities Act provision that exempts from state registration and qualification requirements securities offered or sold to "qualified purchasers." *See* 15 U.S.C. § 77r(b)(4)(D).

The petitioners, William F. Gavin and Monica J. Lindeen (collectively, petitioners), are the chief securities regulators for Massachusetts and Montana, respectively. They argue that, because the SEC declined to adopt a qualified-purchaser definition limited to investors with sufficient wealth, revenue or financial sophistication to protect their interests without state protection, Regulation A-Plus fails both parts of the United States Supreme Court's statutory construction standards enunciated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). They also argue that it should be vacated as arbitrary and capricious because the Commission failed to explain adequately how it protects investors. For the following reasons, we deny the consolidated petitions for review.

---

[1] The SEC promulgated "Regulation A" in 1936. The rule challenged here modernized Regulation A and is referred to as "Regulation A-Plus."

## I.  STATUTORY & REGULATORY BACKGROUND

Securities regulation has existed, in one form or another, since the mid-1800s.[2]  Before the Great Depression, securities were regulated almost exclusively by the states and, beginning with Kansas in 1911, many states imposed comprehensive securities regulation regimes.[3]  Known as "blue-sky" laws,[4] state systems often required not only pre-sale registration of securities but also pre-sale "qualification" or "merit" review of security sales.  Generally, state substantive review prohibited securities sales the state deemed unfair, unjust or inequitable.  *See, e.g.*, Act of Mar. 6, 1933, ch. 47, § 4, 1933 Mont. Laws 72, 76.

After the 1929 stock market crash, the Congress began regulating securities at the federal level.  Rather than following the state substantive-review model, the Congress chose instead to mandate pre-sale disclosure of material information to investors.  It did so by enacting, first, the Securities Act of 1933 (Securities Act), 15 U.S.C. §§ 77a–77aa, which regulates the sale of securities in the primary market and, second, the Securities Exchange Act of 1934

---

[2] *See, e.g.*, Act of May 21, 1852, ch. 303, 1852 Mass. Acts 208 (requiring railroad companies chartered in Massachusetts to file certificates "stating that all of the stock named in [their] charter has been subscribed for by responsible parties, and that twenty per cent[] of the par value of each and every share of the stock thereof has been actually paid into the treasury of the company").

[3] *See also, e.g.*, Act of Mar. 13, 1913, ch. 85, 1913 Mont. Laws 367; Act of May 27, 1921, ch. 499, 1921 Mass. Acts 622.

[4] *See Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) ("The name that is given to the law indicates the evil at which it is aimed; that is, . . . speculative schemes which have no more basis than so many feet of 'blue sky' . . . .").

5

(Exchange Act), 15 U.S.C. §§ 78a–78pp, which created the Commission and established rules governing the resale or exchange of securities in the secondary market. Both the Securities Act and the Exchange Act have evolved considerably since they were first enacted. This case arises against the backdrop of amendments to the Securities Act.

Under section 5 of the Securities Act, a company must file a registration statement and a prospectus with the SEC before it offers its securities for sale. *See* 15 U.S.C. §§ 77c–77h. Because the section 5 registration process is often prohibitively expensive for small companies, the Congress enacted section 3(b) of the Securities Act, which allows the Commission, through rulemaking, to exempt from federal-registration requirements certain small-dollar offerings, so long as the Commission finds that federal registration is not required to protect both investors and the public interest. *Id.* § 77c(b)(1). In 1936, the SEC exercised its section 3(b) authority to promulgate "Regulation A." *See* SEC Release No. 33-632 (Jan. 21, 1936).

Originally, Regulation A allowed a company to file a less expensive "offering statement," rather than the pricey section 5 registration statement, before offering securities for sale. 17 C.F.R. §§ 230.252–.253. To further protect investors, Regulation A forbade any securities sale until SEC staff "qualified" the issuing company's offering statement; moreover, Regulation A obligated the issuing company to deliver an offering circular to investors before consummating any sale. After the sale, investors had the protection of federal antifraud statutes, *see, e.g.*, 15 U.S.C. § 77q; *id.* § 78j(b); 17 C.F.R. § 240.10b-5, as well as the Securities Act's civil liability provisions for false or misleading statements, *see, e.g.*, 15 U.S.C. § 77c(b)(2)(D); *id.* § 77l(a)(2).

Although section 3(b) exempted Regulation A offerings from federal-registration requirements, the offerings generally remained subject to state registration and merit-review restrictions, which increased compliance costs for the issuing company. This was especially true for a company desiring to issue securities in multiple states with varying substantive criteria.

## A. NATIONAL SECURITIES MARKETS IMPROVEMENT ACT OF 1996 (NSMIA), PUB. L. NO. 104-290, 110 STAT. 3416

Aware of the problems caused by concurrent state and federal regulation, the Congress enacted the National Securities Markets Improvement Act of 1996 (NSMIA), Pub. L. No. 104-290, 110 Stat. 3416. Designed to alleviate the "redundant, costly, and ineffective" dual federal/state regulatory system, H.R. CONF. REP. NO. 104–864, at 39, *reprinted in* 1996 U.S.C.C.A.N. 3920, 3920, the NSMIA designated the federal government to oversee nation-wide securities offerings while allowing the states to retain control over small, regional or intrastate offerings.[5] The NSMIA did so by amending section 18 of the Securities Act to preempt, on a widespread basis, state registration and qualification regimes for some offerings while leaving intact the states' authority to investigate fraud and to assess fees. *See* 15 U.S.C. § 77r(c)(1), (c)(3).

---

[5] *See, e.g*., H.R. REP. NO. 104-622, at 16 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3877, 3878 (NSMIA intended to "eliminate the costs and burdens of duplicative and unnecessary regulation" by "designating the Federal government as the exclusive regulator of national offerings of securities" while allowing states to "retain authority to regulate small, regional, or intrastate securities offerings").

The NSMIA achieved this goal by creating a list of "covered" (*i.e.*, preempted) securities. *Id.* § 77r(a)(1)(A). Covered securities include, *inter alia*, securities listed on the New York Stock Exchange or the NASDAQ National Market System and those issued by a registered investment company. *Id.* § 77r(b)(1)–(2). The NSMIA also intended the SEC to play a role in determining its preemptive scope. Specifically, it included in its list of covered securities any security sold "to qualified purchasers, as defined by the Commission by rule." *Id.* § 77r(b)(3). It also granted the Commission authority to "define the term 'qualified purchaser' differently with respect to different categories of securities, consistent with the public interest and the protection of investors." *Id.* In the view of both the House[6] and Senate[7] committees that advanced the NSMIA, "qualified purchasers" would not need state regulatory protection in light of their financial worth and sophistication.

In 2001, the SEC proposed a rule that would have defined "qualified purchaser" universally (*i.e.*, for *any* securities purchase) to mean "accredited investor" as defined by SEC Rule 501(a) of Regulation D. *See* Defining the Term "Qualified Purchaser" Under the Securities Act of 1933, 66

---

[6] *See* H.R. REP. NO. 104-622, at 31 ("[T]he Committee intends that the Commission's definition [of qualified purchasers] be rooted in the belief that 'qualified' purchasers are sophisticated investors, capable of protecting themselves in a manner that renders regulation by State authorities unnecessary.").

[7] *See* S. REP. 104-293, at 15 (1996) ("The bill also codifies another exemption existing in most states—the preemption from state 'blue sky' registration for offers and sales to qualified purchasers. Based on their level of wealth and sophistication, investors who come within the definition of 'qualified purchasers' do not require the protections of registration.").

Fed. Reg. 66,839 (Dec. 27, 2001). SEC Rule 501(a), in turn, provides a list of persons and entities deemed "accredited investors," all of which possess greater-than-average levels of financial wherewithal. 17 C.F.R. § 230.501(a). They include, for instance, business entities, banks, trusts and nonprofit organizations with total assets that exceed $5 million, as well as any natural person with a net worth exceeding $1 million. *See id*. The SEC never finalized the rule using the Rule 501(a) definition.

## B. JUMPSTART OUR BUSINESS STARTUPS ACT (JOBS ACT), PUB. L. NO. 112-106, 126 STAT. 306

Following the most recent economic recession, in 2012 the Congress passed the Jumpstart Our Business Startups Act (JOBS Act), Pub. L. No. 112-106, 126 Stat. 306 (2012). The JOBS Act was intended to spur job creation and economic growth by increasing small-business access to capital markets. By enacting Title IV of the JOBS Act (Title IV), the Congress meant to resuscitate the SEC's historically underutilized Regulation A. It did so in three ways.

First, Title IV added section 3(b)(2) to the Securities Act, which directed the SEC to revamp Regulation A. *See* 15 U.S.C. § 77c(b)(2). Specifically, section 3(b)(2) required the SEC to promulgate a rule adding a new class of securities to section 3's list of those exempt from federal-registration requirements. *See id*. It also sketched out the rough parameters for this new class. *See id*. § 77c(b)(2)(A)–(G). For instance, it mandated that the aggregate offering amount of section 3(b)(2) securities was not to exceed $50 million and the sale of the securities was not to be restricted, *see id.* § 77c(b)(2)(A), (C); it also provided the SEC with authority to create other requirements the Commission deemed necessary

to advance the public interest and to protect investors. *See id.* § 77c(b)(2)(G).

Second, Title IV provided that some of the securities issued under the SEC's forthcoming section 3(b)(2) rule were to be exempt from state registration and qualification requirements. *See* 15 U.S.C. § 77r(b)(4)(D). Title IV did so by expanding the section 18 "covered securities" list to include securities issued pursuant to section 3(b)(2) so long as the securities were offered or sold either (1) on a national securities exchange or (2) "to a qualified purchaser, as defined by the Commission pursuant to [section 18(b)(3)] with respect to that purchase or sale." *Id.* An earlier iteration of Title IV would have also preempted state requirements for any section 3(b)(2) security offered or sold through a broker or dealer, *see* H.R. REP. NO. 112-206, 2 (2011), but, after some congressmembers expressed concern about the wide preemptive effect this provision would have,[8] it was removed before the bill became law.

Third, Title IV ordered the Comptroller General to conduct, within three months of the JOBS Act's enactment, a study to determine the effect of state blue-sky laws on Regulation A offerings. The Comptroller General complied and, in July 2012, reported that the limited use of Regulation A was caused, in part, by the cost of complying with state laws.

---

[8] *See, e.g.*, 157 CONG. REC. H7231 (daily ed. Nov. 2, 2011) (statement of Rep. Gary Peters) ("Regulation A securities can be high-risk offerings that may also be susceptible to fraud, making protections provided by the State regulators an essential [feature]."); H.R. REP. NO. 112-206, 13 (2011) (minority view) ("Regulation A securities are sometimes high-risk offerings that may be susceptible to fraud, making the protections provided by state review essential.").

## C. SECTION 3(B)(2) RULE

On January 23, 2014, the SEC complied with the section 3(b)(2) mandate and proposed a rule designed to overhaul Regulation A. *See* Proposed Rule Amendments for Small and Additional Issues Exemptions Under Section 3(b) of the Securities Act, 79 Fed. Reg. 3,926 (Jan. 23, 2014). The SEC rule proposed the creation of two Regulation A offering "tiers." *Id.* at 3,927. Tier-1 was to apply to offerings up to $5 million and, for the most part, to employ the same federal controls Regulation A had used since its original promulgation in 1936.[9] Tier-2, in contrast, would apply to offerings up to $50 million and include additional investor safeguards. Some of the proposed safeguards were directed at Tier-2 issuers—for instance, the SEC proposed requiring issuers to provide audited financial disclosures with offering circulars and to file, on a continuing basis, annual and semi-annual financial reports with the SEC. Other proposed safeguards were directed at Tier-2 purchasers—specifically, the SEC proposed capping Tier-2 purchases at 10 per cent of the investor's annual income or net worth, whichever is greater.

The proposed rule acknowledged the Comptroller General's conclusion that the cost of state blue-sky law compliance may have contributed to Regulation A's disuse. Many commenters also expressed concern about the cost of state law compliance and some proposed ways to alleviate the burden. For example, the North American Securities Administrators Association (NASAA), appearing as amicus here, proposed a coordinated state review process to harmonize different state substantive requirements. Most

---

[9] The final rule increased the Tier-1 offering limit to $20 million.

commenters, however, "strongly supported some form of state securities law preemption" and the SEC received a variety of suggestions regarding potential "qualified purchaser" definitions.[10] *Id.* at 3,969. As a result, the SEC announced that it intended to promulgate a qualified-purchaser definition to "protect offerees and investors in Regulation A securities, while streamlining compliance and reducing transaction costs." *Id.*

On March 25, 2015, the SEC released Regulation A-Plus. After reviewing extensive public commentary on various qualified-purchaser definitions, the SEC defined the term as "*any person* to whom securities are offered or sold pursuant to a Tier[-]2 offering of this Regulation A." 80 Fed. Reg. at 21,899 (emphasis added) (codified at 17 C.F.R. § 230.256). As a result, Regulation A-Plus preempted all state registration and qualification requirements for Tier-2 securities either (1) purchased by an "accredited investor" or (2) purchased by anyone else so long as the non-accredited investor refrained from purchasing securities valued at more than 10 per cent of his net worth or annual income.[11] *See id.* at 21,895–96, 21,899.

---

[10] *See, e.g.*, 79 Fed. Reg. at 3,969 (suggesting, *inter alia*, that SEC define "qualified purchaser" as "[a]ny purchaser in a Regulation A offering"; "[a]ny purchaser meeting a specified net worth standard, set at or lower than the current 'accredited investor' definition in Rule 501 of Regulation D"; "[a]ny purchaser meeting a net worth or income test based on thresholds below accredited investor thresholds, combined with an investment cap"; and "[a]ny purchaser who purchased through a registered broker-dealer").

[11] Tier-1 offerings, in contrast, remain subject to state registration and qualification requirements.

As required by section 2(b), *see* 15 U.S.C. § 77b(b), Regulation A-Plus analyzed whether its qualified-purchaser definition protects investors and "promote[s] efficiency, competition, and capital formation." 80 Fed. Reg. at 21,864. It did so in light of the JOBS Act goal of "expand[ing] the capital raising options available to smaller and emerging companies." *Id.* at 21,865. After acknowledging that eliminating state-level review might reduce investor protection, *see id.* at 27,886–87, the SEC explained that "[s]everal factors could mitigate" the risk, including the "substantial protections" built into Tier-2 offerings—*i.e.*, the 10 per cent purchase cap and the more rigorous financial disclosure requirements for issuers, *id*. at 21,887.

On May 22, 2015, the petitioners filed timely petitions for review of the SEC's qualified-purchaser definition. Our jurisdiction arises under section 9 of the Securities Act, *see* 15 U.S.C. § 77i, and section 702 of the Administrative Procedure Act (APA), *see* 5 U.S.C. § 702.

## II. ANALYSIS

The petitioners argue that the term qualified purchaser cannot mean "*any* person" to whom Tier-2 securities are offered or sold but instead must limit the universe of purchasers to those with enough financial wealth or sophistication to invest without state-law safeguards. Pet'rs' Br. 1, 3 (emphasis added). They insist that the SEC's rule fails both at *Chevron* Step 1 and at Step 2. They also argue that Regulation A-Plus must be vacated as arbitrary and capricious. We address their arguments in turn.

### A. *CHEVRON* STEP ONE

In the petitioners' view, the SEC's qualified-purchaser definition, which does not restrict Tier-2 sales to wealthy

and/or sophisticated investors, contravenes the plain meaning of the Securities Act. To succeed, they must demonstrate that the Securities Act "unambiguously foreclosed" the SEC's qualified-purchaser definition. *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011) (quotation marks omitted). They have not done so.

To discern the Congress's intent, we generally examine the statutory text, structure, purpose and its legislative history. *See Bell Atl. Tel. Co. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997). That said, "[t]he starting point for our interpretation of a statute is always its language," *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989), and, here, the language of section 18 confirms that the Congress has *not* "directly spoken to the precise question at issue"—namely, the meaning of qualified purchaser in relation to state preemption. *Chevron*, 467 U.S. at 842. Instead, the Congress explicitly authorized the Commission to define the term, *see* 15 U.S.C. § 77r(b)(3) ("qualified purchaser[]" is to be "defined by the Commission by rule"), and to adopt different definitions for different types of securities, *see id.* The explicit grant of definitional authority manifests that the Congress intended the SEC to enjoy broad discretion to decide who may purchase which securities without the encumbrance of state registration and qualification requirements. Exercising this grant, the SEC concluded that all purchasers of Tier-2 securities are qualified so long as non-accredited purchasers limit their purchase to 10 per cent of their annual income or net worth. Nothing in the text of the Securities Act "unambiguously foreclose[s]" the SEC from adopting this definition. *Vill. of Barrington, Ill.*, 636 F.3d at 659.

The petitioners nonetheless insist that the SEC's definition fails at *Chevron* step 1 because: (1) the commonly

understood definition of "qualified," which modifies "purchaser," means that the Commission must in some way reduce the universe of "purchasers" from "any purchaser"; (2) the SEC's definition is not "consistent with the public interest and the protection of investors," 15 U.S.C. § 77r(b)(3); (3) Regulation A-Plus renders the word "qualified" superfluous and otherwise conflicts with the structure of the Securities Act; (4) federal securities law has always linked the term "qualified" with a purchaser's wealth or sophistication; and (5) the NSMIA's legislative history demonstrates that the Congress wanted the SEC to limit a "qualified purchaser" to one with a certain level of wealth or sophistication. None of the petitioners' arguments is persuasive.

The petitioners' common-use argument is straightforward: in their view, the dictionary definition of "qualified" manifests that "qualified purchasers" cannot mean "all" Tier-2 purchasers. But when the "Congress explicitly authorize[s]" an agency to "define [a] term," it "necessarily suggests that Congress did *not* intend the word to be applied in its plain meaning sense." *Women Involved in Farm Econ. v. USDA*, 876 F.2d 994, 1000 (D.C. Cir. 1989) (emphasis in original).[12] And when the Congress enacted the NSMIA and the JOBS Act, it not only gave the Commission authority to

---

[12] *See also Rush Univ. Med. Ctr. v. Burwell*, 763 F.3d 754, 760 (7th Cir. 2014) (challenger "insists that the 'plain language' of a law still controls the meaning of a term even when Congress expressly delegates authority to define the supposedly 'plain' term to an agency. We cannot accept this argument. The plain language of the statute delegates definitional authority to the Secretary; to excise that portion would give the statute a new and unintended meaning. It would also undermine Congress's ability to delegate the power to define terms and thrust the courts into a role that Congress meant to reserve for the agency.").

determine which purchasers are qualified but it also permitted the Commission to define the term differently for different types of securities offerings. *See* 15 U.S.C. § 77r(b)(3). The petitioners identify no statutory provision that bars the SEC from concluding that *all* Tier-2 purchasers are "qualified" in view of the other investor protections built into Tier-2.

Next, the petitioners argue that, because the Securities Act requires that any definition of qualified purchaser must advance "the public interest and the protection of investors," *id.*, the SEC had to promulgate a definition tied to investor wealth or experience. But the Congress explicitly granted the SEC discretion to determine how best to protect the public and investors, *see id.*, and the SEC, in exercising its discretion, concluded that Tier-2 investors are sufficiently protected by Tier-2's purchase cap and reporting requirements. *See* 80 Fed. Reg. at 21,877. Although the petitioners lament that Tier-2 purchasers "may now lose up to 10 percent of their net worth in Regulation A[-Plus] offerings," Pet'rs' Br. 41,[13] their challenge to the SEC's definition does not amount to an unambiguous statutory mandate that the SEC protect investors as the petitioners might prefer.

The petitioners also argue that the SEC definition conflicts with the Securities Act's structure because it (1) renders the term "qualified" superfluous, (2) nullifies the requirement that the definition serve the public interest and

---

[13] The petitioners point out that the SEC does not require Tier-2 offerors to verify that non-accredited purchasers have capped their respective investments at 10 per cent of their income or net worth. Nothing in the Securities Act, however, requires the SEC to ensure investor protection by requiring offerors to police their investors' purchases.

investor protection and (3) amounts to unlawful agency preemption of state law, which is a power possessed by the Congress alone. But the SEC did not nullify the term "qualified"; rather, it concluded that all Tier-2 purchasers are qualified. *See* 80 Fed. Reg. at 21,899. And the SEC's definition does not ignore its obligation to promulgate a definition consistent with the best interests of the public and investors; rather, as discussed, *see supra* § I.C, the SEC explained why it thought its definition achieved this goal. Finally, it was the *Congress*, not the SEC, that decided to preempt state registration and qualification requirements when a security is "offered or sold to a qualified purchaser," 15 U.S.C. § 77r(b)(4)(D)(ii); by instructing the Commission to determine the circumstances under which a "purchaser" is "qualified," the Congress plainly intended the SEC to delineate the scope of state-law preemption.

Undeterred, the petitioners argue that federal securities law has always construed the term "qualified investor" or "qualified purchaser" to mean a limited group with the ability to protect their interests. While it is true that some securities provisions associate the term "qualified" with a purchaser's ability to undertake financial risk,[14] the petitioners' argument

---

[14] *See, e.g.*, 15 U.S.C. § 78c(a)(54)(A), (B) (for exception to broker-dealer Exchange Act registration requirement, "qualified investor" is defined as investment companies, banks, small business investment companies, state-sponsored employee benefit plans, institutional trusts, market intermediaries, and natural persons, corporations or partnerships that own and invest on a discretionary basis more than $25 million (or, in some circumstances, $10 million)); 17 C.F.R. § 230.144A(a)(1) (for SEC Rule 144A, "qualified institutional buyer" is defined as large sophisticated institutional investors that own and invest on discretionary basis at least $100 million in securities and banks and other specified financial institutions with net worth of at least $25 million).

proves only that when the Congress wishes to define "qualified" by reference to wealth or sophistication, it knows how to do so. Here, the Congress's decision to leave the definition to the SEC's discretion demonstrates that the Congress wanted to give the SEC wide latitude. At a minimum, the petitioners' argument falls short of establishing unambiguous congressional intent that a "qualified purchaser" meet a certain level of wealth or sophistication.

Finally, the petitioners argue that the NSMIA's legislative history makes plain that the Congress intended "qualified purchaser" to apply only to wealthy or sophisticated investors. As noted, both the Senate[15] and House[16] committees that advanced the NSMIA believed that qualified purchasers could fend for themselves without state-law protection. But "even the most formidable argument concerning the statute's purposes [cannot] overcome the clarity [found] in the statute's text," *Kloeckner v. Solis*, 133 S. Ct. 596, 607 n.4 (2012), and "only rarely have we relied on legislative history to constrict the otherwise broad application of a statute indicated by its text," *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003); *see also id.* ("[W]hile such history can be used to clarify congressional

---

[15] *See* S. REP. 104-293, at 15 ("Based on their level of wealth and sophistication, investors who come within the definition of 'qualified purchasers' do not require the protections of registration.").

[16] *See* H.R. REP. 104-622, at 31 ("[T]he Commission is given flexible authority to establish various definitions of qualified purchasers" but, "[i]n all cases, . . . the Committee intends that the Commission's definition be rooted in the belief that 'qualified' purchasers are sophisticated investors, capable of protecting themselves in a manner that renders regulation by State authorities unnecessary").

intent even when a statute is superficially unambiguous, the bar is high." (quotation marks omitted)).  To accept the petitioners' legislative-history argument would be to "abandon altogether the text of the statute as a guide in the interpretative process." *Shannon v. United States*, 512 U.S. 573, 583 (1994).

Because Regulation A-Plus does not conflict with the Congress's unambiguous intent, it does not falter at *Chevron* Step 1 and, accordingly, we proceed to *Chevron* step 2.

## B. *CHEVRON* STEP TWO

The petitioners also argue that the SEC's qualified-purchaser definition is unreasonable and therefore fails at *Chevron* Step 2.  Typically, at *Chevron* Step 2, we defer to the Commission so long as its definition is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842–43.   But "[b]ecause Congress has authorized the Commission . . . to prescribe legislative rules, we owe the Commission's judgment more than mere deference or weight." *United States v. O'Hagan*, 521 U.S. 642, 673 (1997) (quotation marks omitted).  Indeed, where, as here, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," we give the regulation "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44; *see also United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) ("When Congress has explicitly left a gap for an agency to fill, . . . any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." (quotation marks omitted)).

The petitioners insist that the SEC's qualified-purchaser definition "is actually 'manifestly contrary to the statute' "

because it imposes no restrictions based on investor wealth, income or sophistication. Pet'rs' Br. 57 (quoting *Chevron*, 467 U.S. at 843). Their *Chevron* Step 2 arguments mirror their *Chevron* Step 1 arguments and, for all of the reasons set out in our *Chevron* Step 1 discussion, we believe the SEC acted reasonably and within its broad definitional authority when it decided that all Tier-2 investors are considered "qualified purchasers."

The petitioners advance three additional *Chevron* Step 2 arguments but none has merit. First, they insist that we must apply a presumption against preemption, according the SEC no deference because, in their view, the Congress's preemptive purpose was not "clear and manifest." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks omitted). We have, however, "rejected the argument that wherever a federal agency's exercise of authority will preempt state power, *Chevron* deference is inappropriate." *Albany Eng'g Corp. v. FERC*, 548 F.3d 1071, 1074 (D.C. Cir. 2008) (quotation marks omitted). In any event, the Congress's decision to exempt "qualified purchasers" from state requirements *was* "clear and manifest," *Medtronic, Inc*., 518 U.S. at 485, as was its decision to authorize the SEC, in its discretion, to determine the scope of state preemption by defining when a "purchaser" is "qualified."

The petitioners' second argument is that the SEC failed to provide a reasoned explanation for its definition. Although an agency enjoys *Chevron* Step 2 deference "only if [it] has offered a reasoned explanation for why it chose that interpretation," *Vill. of Barrington, Ill.*, 636 F.3d at 660, the SEC did in fact explain how its "final rules for Regulation A will provide for a meaningful addition to the existing capital formation options of smaller companies while maintaining important investor protections." 80 Fed. Reg. at 21,813. The

Commission explained that its definition protects investors because Tier-2 offerings require that offerors provide audited financial statements to purchasers and to the SEC on a recurring basis; it also explained that non-accredited Tier-2 purchasers are not permitted to risk more than 10 per cent of their annual income or net worth. *Id.* at 21,858, 21,861. The SEC further explained how its definition helps to revitalize Regulation A, which was the Congress's primary purpose in enacting the JOBS Act. *Id.* at 21,858–59. For these reasons, we find that the SEC has "cogently explain[ed] why it has exercised its discretion in a given manner" and its "explanation [is] . . . sufficient to enable us to conclude that [its action] was the product of reasoned decisionmaking." *U.S. Telecomm. Ass'n v. FCC*, 227 F.3d 450, 460 (D.C. Cir. 2000) (quotation marks omitted).

The petitioners' third argument is that the SEC failed to explain why its qualified-purchaser definition changed from the qualified-purchaser definition it proposed (but never finalized) in 2001. We disagree. It bears noting at the outset that "[a]n initial agency interpretation is not instantly carved in stone," *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1170 (D.C. Cir. 2015) (quoting *Chevron*, 467 U.S. at 863). Moreover, "a proposed regulation does not represent an agency's considered interpretation of its statute and . . . an agency is entitled to consider alternative interpretations before settling on the view it considers most sound," *CFTC v. Schor*, 478 U.S. 833, 845 (1986). Moreover, the Commission explained that its 2001 proposed definition "contemplated that state securities review and qualification requirements would be preempted" for *all* securities although its "rules to implement Title IV of the JOBS Act provide for preemption in the more limited circumstances in which the requirements of [s]ection 3(b)(2) and the rules adopted thereunder are satisfied." 80 Fed. Reg. at 21,859. Given the "new and

different context" outlined in Title IV, *id.* at 21,860, the SEC explained that, notwithstanding it may have been appropriate "to focus on attributes of the purchaser when crafting a 'qualified purchaser' definition that would have applied in a broad set of possible transactions," its Tier-2 qualified-purchaser definition "serves a different purpose because it applies only in Regulation A offerings," *id.* at 21,559–60, which, as already discussed, include additional investor safeguards. *See supra* § I.C.

Because the Commission's qualified-purchaser definition is not "arbitrary, capricious, or manifestly contrary to the statute," *Chevron*, 467 U.S. at 844, it does not fail *Chevron* Step 2.

## C. APA REVIEW

Finally, the petitioners challenge Regulation A-Plus as arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A). A "rule is arbitrary and capricious" if an "agency fail[s] to consider . . . a factor the agency must consider under its organic statute," *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004); section 2(b) of the Securities Act requires that, if the Commission "consider[s] or determine[s] whether an action is necessary or appropriate in the public interest," it must also "consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 77b(b). This inquiry contemplates that the Commission will "determine as best it can the economic implications of the rule." *Chamber of Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). In the petitioners' view, the Commission failed to discharge this duty when it "offered only a single paragraph to explain why existing state

law and the new rule might lessen the adverse effects of 'blue sky' preemption." Pet'rs' Br. 65.

We disagree. By providing a reasoned analysis of how its qualified-purchaser definition strikes the "appropriate balance between mitigating cost and time demands on issuers and *providing investor protections*," 80 Fed. Reg. at 21,888 (emphasis added), the Commission has complied with its statutory obligation. It considered the benefits of blue-sky review, concluding that it "may aid in detecting fraud and facilitating issuer compliance" by providing another level of investor protection. *Id.* at 21,886–87. It also considered the costs imposed on issuers by blue-sky review, relying on the Comptroller General's conclusion that state registration and qualification requirements stymied Regulation A's use in recent years. *See id.* at 21,868. After discussing the Tier-2 protections afforded to investors in the absence of state law review—*e.g.*, federal and state antifraud enforcement authority, enhanced and continuing issuer disclosure requirements and the 10 per cent purchase cap—the SEC concluded that the Tier-2 requirements "reduce[d] the need for, and the expected benefits of, state review." *Id.* at 21,887. Given the JOBS Act mandate to revitalize Regulation A, the SEC concluded that the potential decrease in investor protection was balanced by the reduced costs for Tier-2 issuers and purchasers. *See id.*

In the petitioners' view, the rule should nonetheless be vacated because the SEC failed to show that Tier-2's safeguards "will *actually* mitigate the identified costs of preemption." Pet'rs' Br. 67 (emphasis added). For its part, amicus NASAA faults the SEC for relying on "little to no evidence" regarding the costs of state-law compliance and state-law preemption. NASAA Br. 26–27. But, as noted, Regulation A was rarely used, which means that the

Commission did not have the data necessary to quantify precisely the risks of preemption for investors and the costs of state-law compliance for issuers. We do not require the Commission "to measure the immeasurable" and we do not require it to "conduct a rigorous, quantitative economic analysis unless the statute explicitly directs it to do so." *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 369 (D.C. Cir. 2014) (quotation marks omitted), *overruled on other grounds by Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) (*en banc*). Here, we find that the SEC's "discussion of unquantifiable benefits fulfills its statutory obligation to consider and evaluate potential costs and benefits," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013); because the SEC articulated "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice[] made," *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (quotation marks omitted), we uphold Regulation A-Plus.

For the foregoing reasons, the consolidated petitions for review are denied.

*So ordered.*