NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13381

ROBINHOOD FINANCIAL LLC  vs.  SECRETARY OF THE COMMONWEALTH &
another.[1]


Suffolk.     May 3, 2023. - August 25, 2023.

Present:  Gaziano, Lowy, Cypher, Wendlandt, & Georges, JJ.


Securities.  Broker.  Investment Advisor.  Fiduciary.  Secretary
    of the Commonwealth.  Regulation.  Common Law.
    Constitutional Law, Delegation of powers, Separation of
    powers, Federal preemption.  Federal Preemption.  Uniform
    Securities Act.



    Civil action commenced in the Superior Court Department on
April 15, 2021.

    The case was heard by Michael D. Ricciuti, J., on motions
for judgment on the pleadings.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Phoebe Fischer-Groban, Assistant Attorney General, for the
defendants.
    Amy Mason Saharia (John S. Williams, of the District of
Columbia, Timothy P. Burke, & Jason S. Pinney also present) for
the plaintiff.
    The following submitted briefs for amici curiae:

_____

    [1] Securities Division of the Office of the Secretary of the
Commonwealth.

Ben Robbins & Daniel B. Winslow for New England Legal Foundation.

Shay Dvoretzky, of the District of Columbia, Eben P. Colby, & Marley Ann Brumme for Chamber of Commerce of the United States of America & another.

Robert S. Banks, Jr., of Oregon, & William A. Jacobson for Cornell Securities Law Clinic.

Timothy Cornell & Patrick J. Dolan for Public Investors Advocate Bar Association.

Elizabeth Aniskevich & Benjamin Davis, of the District of Columbia, Stuart Rossman, & Shennan Kavanagh for AARP & others.

Timothy Cornell & Patrick J. Dolan for Institute for the Fiduciary Standard & another.

Dennis M. Kelleher for Better Markets, Inc.

James F. Radke & Dylan White for North American Securities Administrators Association, Inc.

WENDLANDT, J.  Unlike the fabled "Prince of Thieves," who took from the rich to give to the poor,[2] the plaintiff Robinhood Financial LLC (Robinhood), is accused by the Secretary of the Commonwealth (Secretary) of taking advantage of unsophisticated investors to fill its own coffers by dispensing ill-suited investment advice to these customers and by encouraging them to engage in risky trading practices using its online trading platform.  This conduct, the Secretary alleges, violated the prohibition of the Massachusetts Uniform Securities Act, G. L. c. 110A (MUSA), against "unethical or dishonest conduct or practices in the securities, commodities[,] or insurance business," G. L. c. 110A, § 204 (a) (2) (G) -- a phrase that the Secretary has defined to require broker-dealers that provide

_____

[2] Howard Pyle, The Merry Adventures of Robin Hood (1883).

investment advice to retail customers to comply with a statutorily defined fiduciary duty, see 950 Code Mass. Regs. § 12.207(1)(a) (2020) (fiduciary duty rule or rule). Unlike prior standards of care, which differentiated between broker-dealers and investment advisers in view of their traditionally distinct investment services and offerings, the rule brings the fiduciary obligations of broker-dealers in line with those of investment advisers, making uniform the duties owed by those engaged in the business of providing investment advice regardless of label. The rule, according to the Secretary, was needed to protect investors confused by the increasingly blurred line between broker-dealers providing investment advice and investment advisers.

This case concerns the question whether, by promulgating the fiduciary duty rule, the Secretary overstepped the bounds of the authority granted to him under MUSA. We conclude that he did not. We further conclude that the fiduciary duty rule does not override the common-law protections available to investors, that MUSA is not an impermissible delegation of legislative power, and that the rule is not preempted by the Securities and Exchange Commission's (SEC) determination to impose a national "best interest" standard of care on broker-dealers, 17 C.F.R.

§ 240.15l-1 (2019) (Regulation Best Interest).[3]  We therefore reverse the judgment entered by a Superior Court judge on the pleadings in a civil action challenging the validity of the fiduciary duty rule, and we remand the matter for further proceedings.

1.  Background.[4]  This appeal stems from an administrative enforcement proceeding brought by the Secretary against Robinhood, alleging that Robinhood violated MUSA by, inter alia, engaging in "unethical or dishonest conduct or practices in the securities, commodities[,] or insurance business," G. L. c. 110A, § 204 (a) (2) (G).  In particular, the Secretary alleged that Robinhood provided investment recommendations[5] to

---

[3] We acknowledge the briefs of amici curiae AARP, AARP Foundation, and the National Consumer Law Center; Better Markets, Inc.; the Chamber of Commerce of the United States of America and the Greater Boston Chamber of Commerce; the Cornell Securities Law Clinic; the Institute for the Fiduciary Standard and Tamar Frankel; the New England Legal Foundation; the North American Securities Administrators Association, Inc.; and the Public Investors Advocate Bar Association.

[4] Because the case comes before us on the parties' cross motions for judgment on the pleadings, "[w]e recite the facts 'drawn from the parties' pleadings and the exhibits attached thereto,'" Mullins v. Corcoran, 488 Mass. 275, 276 (2021), quoting Merriam v. Demoulas Super Mkts., Inc., 464 Mass. 721, 723 (2013), reserving some facts for later discussion.

[5] The Secretary claimed that Robinhood encouraged "frequent, risky, and unsuitable trading" by "[i]nexperienced [i]nvestors," published investment categories like "100 Most Popular" or "Top Movers," and implemented "[s]trategies to [e]ncourage and [i]ncentivize" customer engagement with its trading platform;

its Internet-based[6] customers without considering whether those recommendations were in each customer's best interest; this conduct, the Secretary contends, violated Robinhood's fiduciary duties of care and loyalty under the fiduciary duty rule. Robinhood denies the allegations, maintaining that, as a "self-directed" brokerage firm, it does not make investment recommendations or provide investment advice.[7]

After the Secretary initiated the administrative proceeding, Robinhood brought the instant action challenging the validity of the fiduciary duty rule.[8]  On the parties' cross motions for judgment on the pleadings, see Mass. R. Civ. P. 12 (c), 365 Mass. 754 (1974), a Superior Court judge determined

---

each such practice, the Secretary alleged, was tantamount to making investment recommendations to customers.  The administrative complaint also alleged that Robinhood "targeted young individuals with little or no investment experience; lacked adequate infrastructure and, as a result, experienced repeated outages and disruptions on its trading platform; . . . and failed to follow its own written supervisory procedures when approving customers for options trading."

[6] Robinhood provides its services on a mobile application and website-based trading platform, which, as of 2021, were two of the most common methods for placing trades.  See Lin, Bumcrot, Mottola, Valdes, & Walsh, FINRA Investor Education Foundation, Investors in the United States:  The Changing Landscape 10 (Dec. 2022).

[7] We address only the purely legal issues presented on appeal, which are unaffected by this dispute of material fact.

[8] In addition to 950 Code Mass. Regs. § 12.207(1)(a), Robinhood challenges the sections of Title 950 that refer to it.

that the Secretary acted ultra vires,[9] exceeding his authority in promulgating the rule.  The Secretary appealed, and we allowed Robinhood's unopposed application for direct appellate review.

2.  Regulatory framework.  A brief review of the regulatory framework for investment service providers grounds our analysis of Robinhood's legal arguments, which are rooted in the traditional differences between the investment services provided by broker-dealers and investment advisers, as well as the different standards of care that consequently have been applicable to each.

a.  Investment services.  Historically, broker-dealers have offered services to facilitate and execute securities transactions chosen by their customers, earning commissions on these trades.[10]  At most, they have provided, free of any

---

[9] "Ultra vires," which is Latin for "beyond the powers (of)," describes actions that are "beyond the scope of power allowed or granted by . . . law."  Black's Law Dictionary 1833 (11th ed. 2019).  "When an agency acts beyond the scope of authority conferred to it by statute, its actions are invalid and ultra vires."  Armstrong v. Secretary of Energy & Envtl. Affairs, 490 Mass. 243, 247 (2022).

[10] See G. L. c. 110A, § 401 (c) (defining broker-dealer as "any person engaged in the business of effecting transactions in securities for the account of others or for his own account").  See also 15 U.S.C. §§ 77b(a)(12) (defining dealer as person who engages "in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person"), 78c(a)(4)(A) (defining broker as person "engaged in the business of effecting transactions in securities for the account of others").

additional fee, investment advice that was solely incidental to the effected transactions.[11]

By contrast, investment advisers traditionally have provided ongoing investment advice, often taking the responsibility of continuous account management.[12]  Rather than charging a commission for each transaction, investment advisers usually charged a periodic fee calculated as a percentage of a customer's assets under management.

As a result of the different investment services offered by each, Federal and State law historically have held broker-dealers and investment advisers to different standards of care. Investment advisers, because of their trusted advisory role, generally must comply with the full complement of fiduciary duties of "utmost good faith, and full and fair disclosure of all material facts," and shoulder an "affirmative obligation to

---

[11] See Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(11)(C) (Investment Advisers Act) (excluding broker-dealers from definition of investment adviser if their "performance of [investment advice] services is solely incidental to the conduct of [their] business as a broker or dealer" and if they "receive[] no special compensation therefor"); G. L. c. 110A, § 401 (m) (1) (F) (excluding registered broker-dealers from definition of investment adviser).

[12] See G. L. c. 110A, § 401 (m) (defining investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to value of securities or as to the advisability of investing in, purchasing, or selling securities").  See also 15 U.S.C. § 80b-2(a)(11) (same).

'employ reasonable care to avoid misleading'" clients (citations omitted). Securities & Exch. Comm'n v. Capital Gains Research Bur., Inc., 375 U.S. 180, 194 (1963). See Investment Advisers Act of 1940, 15 U.S.C. § 80b-6 (Investment Advisers Act).

Broker-dealers, because of their more limited role, have been subject to traditional agency principles when executing customers' transactions. See, e.g., Hill v. Bache Halsey Stuart Shields Inc., 790 F.2d 817, 824 (10th Cir. 1986) (broker, as customer's agent, generally owed fiduciary duties, but scope of duties turned on nature of broker's responsibilities because agent is only fiduciary within scope of agency). In addition, where a broker-dealer made a recommendation incidental to effecting a transaction, a broker-dealer must "have [had] a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the [broker-dealer] to ascertain the customer's investment profile." Financial Industry Regulatory Authority, Inc. (FINRA), FINRA rule 2111(a), https://www.finra.org/rules-guidance/rulebooks/finra-rules/2111 [https://perma.cc/RCS4-4KKX] (suitability standard).[13]

---

[13] As discussed infra, a broker-dealer also is subject to common-law obligations of care, the precise contours of which

Over time, the once-clear dichotomy between the services offered by broker-dealers, on the one hand, and investment advisers, on the other, has "blurred." XY Planning Network, LLC v. United States Sec. & Exch. Comm'n, 963 F.3d 244, 247 (2d Cir. 2020). Certain broker-dealers expanded the types of services and products they offered to retail customers, "often provid[ing] advice and mak[ing] recommendations about securities transactions and investment strategies." Id. at 248.[14] These broker-dealers also changed their marketing; "financial services firms began to use a variety of titles to describe their personnel, such as 'financial advis[er],' 'financial consultant,' and 'advis[er],'" Securities and Exchange Commission, Study on Investment Advisers and Broker-Dealers as Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act 99 (Jan. 2011), https://www.sec.gov

---

vary depending on the relationship between the broker-dealer and the client.

[14] See Laby, Selling Advice and Creating Expectations:  Why Brokers Should be Fiduciaries, 87 Wash. L. Rev. 707, 730 (2012) ("The birth of electronic markets and the development of electronic trading[, which] automated much of the day-to-day enterprise of transaction execution without the use of [broker-dealers]," led broker-dealers to enhance their services by providing advice, "tilt[ing] the balance of brokers' activity away from execution and toward advice").  See also Note, Regulation Best Interest and the State-Agency Conflict, 120 Colum. L. Rev. 1591, 1597-1598 (2020) (detailing history of broker-dealers beginning to offer financial planning services in 1980s and shifting from charging commission on trades to fee-based pricing).

/news/studies/2011/913studyfinal.pdf [https://perma.cc/7THA-E22R] (Section 913 study, discussed _infra_).[15]

Additionally, some broker-dealers' compensation models morphed.  Rather than charging commissions, some broker-dealers draw revenue from "payments for order flow" -- "a method of transferring some of the trading profits from market making to the brokers that route customer orders to specialists for execution," Securities & Exchange Commission, Special Study: Payment for Order Flow and Internalization in the Options Markets (Dec. 2020), https://www.sec.gov/news/studies/ordpay.htm [https://perma.cc/PE6G-TS7G].[16]  Under this compensation model, a

---

[15] See Hauptman & Roper, Consumer Federation of America, Financial Advisor or Investment Salesperson?  Brokers and Insurers Want to Have it Both Ways 10-11 (2017), https://consumerfed.org/wp-content/uploads/2017/01/1-18-17-Advisor-or-Salesperson_Report.pdf [https://perma.cc/FM53-Z988] ("In addition to describing their financial professionals as advis[e]rs and describing their services as advisory in nature, sales-based firms also routinely use messaging that is designed to foster a relationship of trust and reliance," e.g., "Our clients always come first," and "Everything we are, do and hope to achieve . . . is driven by a straightforward mission:  To provide the best financial advice and service to our clients" [citations omitted]).

[16] Payments for order flow involve "a type of volume discount -- in either cash or in-kind services -- by which market makers (who actually execute securities transactions) reward brokers for having directed business to them." _Gilman_ v. _BHC Sec., Inc._, 104 F.3d 1418, 1420 (2d Cir. 1997).  See Note, Why Robinhood is Not a Fiduciary, 39 Yale J. Reg. 1445, 1469 (2022) (under payment for order flow model, broker-dealer firms could be "engaged in the practice of skimming off the top of orders and giving users a higher price").

broker-dealer's revenues are tied to the number of trades its customers execute, arguably providing an incentive to prefer third parties with the best rebate for the broker-dealer, see Gilman v. BHC Sec., Inc., 104 F.3d 1418, 1423-1424 (2d Cir. 1997), over those with the best execution price for clients.[17]

These industry transformations have made the securities markets more readily available to more investors;[18] however, the changes also have caused consumer confusion and investor harm despite the existing suitability standard for broker-dealers, see Section 913 study, supra at 93-94. As a result, Federal and State authorities have questioned whether adhering to the traditional dichotomy between the standard of care owed to customers by broker-dealers and investment advisers continues to make sense in this evolving marketplace. See infra.

b. SEC's Regulation Best Interest. Congress, for example, passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), Pub. L. No. 111-203, § 913, 124 Stat. 1376, 1824-1830 (2010), authorizing the SEC to promulgate a new standard of care for broker-dealers suitable to the evolving

---

[17] See Duggan, Forbes Advisor, Could the SEC End Payment for Order Flow? (Aug. 22, 2022), https://www.forbes.com/advisor /investing/payment-for-order-flow/ [https://perma.cc/K42K-64EW].

[18] According to Robinhood, its business model has "created competition in the brokerage industry," increasing consumers' access to the investment market and causing other broker-dealers to eliminate commissions, a trend called the "Robinhood effect."

landscape and equal to "the standard of conduct applicable to . . . investment adviser[s] under . . . the Investment Advisers Act," Dodd-Frank § 913(g)(1), 124 Stat. at 1828. It asked the SEC to consider whether, when providing investment advice to retail customers, broker-dealers should be required to "act in the best interest of the customer without regard to the financial or other interest of the [broker-dealer] providing the advice." Dodd-Frank § 913(g)(2), 124 Stat. at 1828. Congress also directed the SEC to conduct a study (Section 913 study) to evaluate "the effectiveness of existing legal or regulatory standards of care for [broker-dealers] . . . for providing personalized investment advice and recommendations about securities to retail customers" and to review "whether there are legal or regulatory gaps" in the existing regulatory scheme relating to such standards of care. Dodd-Frank § 913(b), 124 Stat. at 1824.

The subsequent study confirmed that retail investors often "d[id] not understand the differences between investment advisers and broker-dealers or the standards of care applicable to broker-dealers and investment advisers"; information gathered regarding "investor understanding of the roles, duties[,] and obligations of investment advisers and broker-dealers . . . reflect[ed] confusion by retail investors regarding the roles, titles, and legal obligations of investment advisers and broker-

dealers." Section 913 study, <u>supra</u> at v. In the Section 913 study's findings, the authors recommended the adoption of a "<u>uniform</u> fiduciary standard . . . regardless of the regulatory label (broker-dealer or investment adviser) of the professional providing the advice [emphasis added]." <u>Id</u>. at v-viii.

The SEC stopped short of proposing a uniform standard. Instead, it proposed a general obligation on broker-dealers, requiring that

> "all broker-dealers . . . when making a recommendation of any securities transaction or investment strategy involving securities to a retail customer, act in the best interest of the retail customer at the time the recommendation is made without placing the financial or other interest of the broker-dealer . . . ahead of the interest of the retail customer" (general obligation).

Regulation Best Interest, Release No. 34-83062, 83 Fed. Reg. 21,574, 21,575 (May 9, 2018).

In July 2019, the SEC adopted the Regulation Best Interest notwithstanding the Secretary's concerns that the general obligation would fail to protect investors who were confused by the differences between investment advisors providing investment advice and recommendations and broker-dealers who also gave investment advice and recommendations.[19] See Regulation Best

---

[19] The Secretary criticized the proposed general obligation and urged the SEC instead to adopt a "strong uniform fiduciary standard" that would impose on broker-dealers a fiduciary duty to customers equal to that of investment advisers. Secretary of the Commonwealth, Comment Letter on "Regulation Best Interest"

Interest, Release No. 34-86031, 84 Fed. Reg. 33,318, 33,329-33,330 (July 29, 2019); 17 C.F.R. § 240.15l-1 (2019). The SEC explained that the general obligation comprised four component parts: (1) a "[d]isclosure obligation," requiring broker-dealers to fully and fairly disclose, in writing, any material facts relating to the scope and terms of the relationship with the customer, including material conflicts of interest related to investment recommendations, prior to or at the time of the recommendation; (2) a "[c]are obligation," requiring broker-dealers to exercise "reasonable diligence, care, and skill" when making a recommendation to a retail customer, including developing a "reasonable basis" to believe that a recommendation is in the "best interest" of a particular customer; (3) a "[c]onflict of interest obligation," requiring that broker-dealers have and enforce written policies and procedures reasonably designed to identify, mitigate, and disclose

---

Proposal, Release No. 34-83062, at 1 (Aug. 7, 2018). "As a regulator," the Secretary wrote, he had "seen the grievous harm suffered by Main Street investors who mistakenly trusted and relied on conflicted investment advice [given by broker-dealers]." Id. The proposed best interest standard for broker-dealers, the Secretary continued, was "for all intents and purposes substantially the same as the current suitability standard," and, he predicted, it would "foster confusion and . . . fail to protect vulnerable investors." Id. at 2. "If the Commission [did] not adopt a strong and uniform fiduciary standard," the Secretary explained, "Massachusetts [would] be forced to adopt its own fiduciary standard to protect [its] citizens from conflicted advice by broker-dealers." Id. at 1.

conflicts of interest, and to prevent conflicts that would cause them to make recommendations that place their own interests ahead of customers'; and (4) a "[c]ompliance obligation," requiring broker-dealers to adopt and enforce written policies and practices "reasonably designed to achieve compliance with" the Regulation Best Interest.  17 C.F.R. § 240.15l-1(a)(2)(i)-(iv).

c.  Fiduciary duty rule.  Responding to the SEC's decision not to apply a uniform standard, the Secretary published a preliminary solicitation for public comments on a proposed State "regulation to apply a fiduciary conduct standard on broker-dealers, agents, investment advisers, and investment adviser representatives when dealing with their customers and clients." See Secretary of the Commonwealth, Securities Division, Preliminary Solicitation of Public Comments:  Fiduciary Conduct Standard for Broker-Dealers, Agents, Investment Advisers, and Investment Adviser Representatives (June 14, 2019) (Preliminary Solicitation for Public Comments).  He noted the "severe financial harm" investors had experienced despite the prior suitability standard, and he criticized the Regulation Best Interest for failing to define the key term "best interest," and setting "ambiguous requirements for how longstanding conflicts in the securities industry must be addressed."  Id.

A uniform fiduciary duty rule was necessary for the protection of Massachusetts investors and was in the public interest, the Secretary concluded, because investors often lacked the "education and background" to navigate the disclosures distinguishing between broker-dealers and investment advisers. Preliminary Solicitation for Public Comments, supra. He relied on empirical studies demonstrating that some investors were "fundamentally confused about the differences between broker-dealers and investment advisers" when receiving investment advice. Id.

In December 2019, the Secretary issued a superseding request for comment on a revised draft rule, in which he reiterated that the fiduciary duty rule was necessary to protect investors because it would ensure that broker-dealers, who were increasingly "hold[ing] themselves out as providing[] trusted advice" to investors, would be held to the "same fiduciary standard as investment advisers when providing advice." Secretary of the Commonwealth, Securities Division, Solicitation of Comments on Proposed Fiduciary Conduct Standard for Broker-Dealers, Agents, Investment Advisers, and Investment Adviser Representatives 2 (Dec. 13, 2019) (Solicitation of Comments). It would require broker-dealers to "make recommendations and provide advice based on what is best for the customer or client, without regard to the interests of any other person." Id. at 5.

The Secretary also responded to concerns that imposing a fiduciary duty on broker-dealers would "effectively restrict investor choice and access to products and services by increasing the cost of advice." Solicitation of Comments, supra at 3. He explained that "[w]hen preserving 'choice' means preserving the option to choose opaque, poorly understood products that are sold via heavily conflicted advice, the benefits of such 'choice' are illusory." Id. He continued, "[t]here is no room for 'you get what you pay for' when it comes to the quality and integrity of investment advice." Id. at 3-4. Moreover, he concluded that the fiduciary duty rule would "enhance[] the quality of advice in the transactional, episodic brokerage model without imposing any new ongoing obligations upon those providing it." Id. at 4.

In March 2020, the Secretary promulgated the fiduciary duty rule. The rule deems it "unethical or dishonest conduct or practices" under G. L. c. 110A, § 204 (a) (2) (G), for a broker-dealer to "fail[] to act in accordance with a fiduciary duty to a customer[20] when providing investment advice or recommending an

---

[20] The term "customer" is defined to exclude:

"(a) [a] bank, savings and loan association, insurance company, trust company, or registered investment company; (b) [a] broker-dealer registered with a [S]tate securities commission . . . ; (c) [a]n investment adviser registered with the SEC under the Investment Advisers Act of 1940

investment strategy, the opening of or transferring of assets to any type of account, or the purchase, sale, or exchange of any security." 950 Code Mass. Regs. § 12.207(1)(a).[21] The rule requires broker-dealers that provide investment advice to adhere "to duties of utmost care and loyalty to the customer," bringing their fiduciary obligations when providing investment advice more in line with the standards applicable to investment advisors. 950 Code Mass. Regs. § 12.207(2). The "duty of care," the rule explains, requires "a broker-dealer or agent to use the care, skill, prudence, and diligence that a person acting in a like capacity and familiar with such matters would use, taking into consideration all of the relevant facts and circumstances."[22] 950 Code Mass. Regs. § 12.207(2)(a). The

---

> § 203 or with a [S]tate securities commission (or agency or office performing like functions); or (d) [a]ny other institutional buyer, as defined [by regulation]."

950 Code Mass. Regs. § 12.207(3).

[21] Pursuant to 950 Code Mass. Regs. § 12.204(1)(a)(29), violation of 950 Code Mass. Regs. § 12.207 is "grounds for imposition of an administrative fine, censure, denial, suspension[,] or revocation of a registration, or such other appropriate action."

[22] To comply with the duty of care, broker-dealers "shall make reasonable inquiry," which requires consideration of "[t]he risks, costs, and conflicts of interest related to all recommendations made and investment advice given"; "[t]he customer's investment objectives, risk tolerance, financial situation, and needs"; and "[a]ny other relevant information." 950 Code Mass. Regs. § 12.207(2)(a)(1)-(3).

"duty of loyalty" requires a broker-dealer or agent to (1) "[d]isclose all material conflicts of interest"; (2) "[m]ake all reasonably practicable efforts to avoid conflicts of interest, eliminate conflicts that cannot reasonably be avoided, and mitigate conflicts that cannot reasonably be avoided or eliminated"; and (3) "[m]ake recommendations and provide investment advice without regard to the financial or any other interest of any party other than the customer."  950 Code Mass. Regs. § 12.207(2)(b)(1)-(3).  "Disclosing conflicts alone does not meet or demonstrate the duty of loyalty."  950 Code Mass. Regs. § 12.207(2)(c).

3.  Discussion.  a.  Standard of review.  "We review the allowance of a motion for judgment on the pleadings de novo." Mullins v. Corcoran, 488 Mass. 275, 281 (2021).  "In deciding the motion, all facts pleaded by the [party who did not prevail below] must be accepted as true."  Id., citing Jarosz v. Palmer, 436 Mass. 526, 529-530 (2002).  "We . . . may rely on 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'"  Mullins, supra, quoting Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000). Each issue on appeal is a question of law, likewise subject to de novo review.  See Fournier v. Secretary of the Exec. Office of Health & Human Servs., 488 Mass. 43, 50 (2021), citing

Guilfoil v. Secretary of the Exec. Office of Health & Human Servs., 486 Mass. 788, 793 (2021).

b. Secretary's authority under MUSA. We turn first to Robinhood's contention that issuance of the fiduciary duty rule exceeded the Secretary's authority under MUSA because the rule upsets the long-standing regulatory framework described supra, pursuant to which broker-dealers traditionally were subject to a different standard of care from that applicable to investment advisers. Our analysis begins with the recognition that "[d]uly promulgated regulations of an administrative agency are presumptively valid and 'must be accorded all the deference due to a statute.'" Craft Beer Guild, LLC v. Alcoholic Beverages Control Comm'n, 481 Mass. 506, 520 (2019), quoting Pepin v. Division of Fisheries & Wildlife, 467 Mass. 210, 221 (2014). Accordingly, "[t]he burden of demonstrating invalidity rests squarely on the party challenging the regulation." Craft Beer Guild, LLC, supra, citing Pepin, supra.

Adopted in 1972, MUSA was designed to protect investors by regulating securities offerings in the Commonwealth. Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 460 Mass. 647, 652, 655 (2011), cert. denied, 566 U.S. 987 (2012) (MUSA "largely tracks" Federal Securities Act of 1933, purpose of which was "to protect investors"). MUSA broadly authorizes the Secretary to administer the law, giving him extensive

investigative and enforcement powers.  See G. L. c. 110A,
§§ 406 (a), 407-408.[23]  MUSA permits the Secretary to make rules
that "are necessary to carry out the provisions of [MUSA],"
including rules that "defin[e] any terms, whether or not used in
[MUSA], insofar as the definitions are not inconsistent with the
provisions of [MUSA]."  G. L. c. 110A, § 412 (a).  The
authorization permits the Secretary discretion to establish
regulations "necessary or appropriate in the public interest or
for the protection of investors and consistent with the purposes
fairly intended by the policy and provisions of [MUSA]."  G. L.
c. 110A, § 412 (b).  See, e.g., Massachusetts Fed'n of Teachers,
AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 773 (2002).[24]

The broad-ranging authority evinces the Legislature's
determination that the Secretary is best "suited to the task of
clarifying the Legislature's plan through specific rules,"

---

[23] The Secretary is delegated the authority to, for example, investigate and sanction misconduct under MUSA by broker-dealers, including by issuing subpoenas and cease-and-desist orders, and levying fines or other sanctions.  G. L. c. 110A, §§ 204, 407, 407A.

[24] In Massachusetts Fed'n of Teachers, AFT, AFL-CIO, 436 Mass. at 773, we recognized that a rulemaking delegation provision akin to MUSA's -- providing the Board of Education with the "authority to promulgate, amend[,] and rescind such rules and regulations as may be necessary to carry out the provisions of [the educator qualifications section of the Education Reform Act]," see id. at 768, quoting G. L. c. 71, § 38G -- gave the agency broad authority to adopt regulations to fulfill the statutory mandate.

Goldberg v. Board of Health of Granby, 444 Mass. 627, 633-634 (2005), and its conclusion that the Secretary, because of his "experience, technical competence, and specialized knowledge" is well positioned to address the program of reform at issue, Souza v. Registrar of Motor Vehicles, 462 Mass. 227, 229 (2012), quoting G. L. c. 30A, § 14 (7), which in the case of MUSA is investor protection, see Bulldog Investors Gen. Partnership, 460 Mass. at 652, 655.  Relevant here, the "Legislature's silence" as to the particular "conduct or practice" deemed to be "unethical or dishonest" for purposes of an enforcement action under G. L. c. 110A, § 204 (a) (2) (G),[25] coupled with the wide authorization given to the Secretary under MUSA, constitutes "an invitation to [the Secretary] to fill the gap with appropriate regulation."  McCauley v. Superintendent, Mass. Correctional Inst., Norfolk, 491 Mass. 571, 585-586 (2023), quoting Massachusetts Teachers' Retirement Sys. v. Contributory Retirement Appeal Bd., 466 Mass. 292, 301 (2013).  See, e.g., Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 771 (1980)

_____

[25] Robinhood mistakenly asserts that the Secretary's definition of "unethical or dishonest conduct or practices" to include the failure to abide by the fiduciary duty rule is inconsistent with the dictionary definitions of those terms. See Black's Law Dictionary 790 (4th rev. ed. 1968) (defining "fraudulent or dishonest act" as one that "involves bad faith, a breach of honesty, a want of integrity, or moral turpitude"); id. at 1698 (defining "unethical" as "not according to business or professional standards").

("The purpose of an open-ended legislative use of the words 'unfair' and 'deceptive' [in G. L. c. 93A, the consumer protection statute] was to allow for the regulation [by the Attorney General] of future, as-yet-undevised, business practices").

Pursuant to this expansive authority, before adopting the fiduciary duty rule, the Secretary considered, inter alia, the Securities Division's enforcement experience, empirical studies, the Section 913 study and its recommendations, and public comments related to the relationship between broker-dealers and their customers.  See generally Solicitation of Comments, supra. Many investors, these sources highlighted, did not understand the different standards of care required of broker-dealers and investment advisers because of the increasingly blurred lines between the two as broker-dealers expanded their offerings, changed their marketing to the public, and moved to different compensation models.  Increasingly, investors mistakenly believed that the broker-dealers had a fiduciary obligation equal to investment advisers to act in their customers' best interests, as discussed supra, and this mistake resulted in investor harm.[26]  See Section 913 study, supra at v.  Indeed, the

---

[26] See A.A. Hung, N. Clancy, J. Dominitz, E. Talley, C. Berrebi, & F. Suvankulov, RAND Institute for Civil Justice, Investor and Industry Perspectives on Investment Advisers and

recommendation of the authors of the report following the Section 913 study, which conducted a comprehensive investigation at the national level, also was to impose a "uniform fiduciary standard" applicable to both broker-dealers and investment advisers, in order to best protect investors. Id.

As a result of the Secretary's investigation, he concluded that the fiduciary duty rule best ensured that MUSA's protections aligned with investors' expectations in the evolving investment landscape. Accordingly, the Secretary determined that the fiduciary duty rule was necessary to fulfill MUSA's broad investor protection purpose, consistent with the Secretary's obligation to police "unethical or dishonest conduct or practices," pursuant to G. L. c. 110A, § 204 (a) (2) (G).

i. Industry norms. Despite the authority given to the Secretary under MUSA, Robinhood maintains that, because MUSA proscribes "any unethical or dishonest conduct or practices in the securities, commodities[,] or insurance business" (emphasis added), G. L. c. 110A, § 204 (a) (2) (G), the Legislature implicitly adopted a standard of care limited to existing

Broker-Dealers 115 (2008) ("the industry is becoming increasingly complex and intertwined and . . . investors do not operate with a clear understanding of the different functions and fiduciary responsibilities of their financial professionals"); id. at 113 (household investor study revealed that "the roles of broker-dealers and investment advisers are confusing to most survey respondents and focus-group participants").

industry norms, which traditionally have treated broker-dealers differently from investment advisers as regards the standard of care owed to customers. This argument fails to consider the extensive record relied on by the Secretary showing that the industry has strayed from the traditional model for the provision of investor services, as broker-dealers have changed their offerings, marketing, and compensation models. See discussion supra.

In response to this industry change and the resulting investor confusion and harm, the SEC already altered "industry norms," by imposing on broker-dealers increased fiduciary obligations under the Regulation Best Interest; and, concluding that those were insufficiently clear to address investor confusion, the Secretary adopted a uniform fiduciary duty rule. To be sure, the rule imposes an obligation on broker-dealers beyond that attendant to the prior suitability standard, see supra, and is clearer than the standard under Regulation Best Interest, which does not define "best interest." But the rule is driven by changes in the prior "norms" of the marketplace that have caused investor harm, the Secretary found.[27]

---

[27] Contrary to Robinhood's argument, the fact that other State courts, in assessing the constitutionality of the phrase "unethical or dishonest conduct or practices" against charges of vagueness, construed "unethical or dishonest conduct or practices" through the lens of industry norms does not confine

Consistent with his extensive authority and the flexibility it necessarily portends, the Secretary permissibly adapted the standard of care required of these new-age broker-dealers, who have themselves adopted new business models inconsistent with their traditional roles and prior industry norms,[28] to carry out his charge under MUSA to protect investors, see Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 54 (2004) (MUSA has "consumer-oriented focus").  MUSA authorizes the Secretary to define the phrase "unethical or dishonest conduct or practices," so long as he does so consistent with the purpose of MUSA to protect investors; his determination that the fiduciary duty rule was necessary for that purpose is owed deference, where, as here, the conclusion is supported by the extensive regulatory

the phrase to existing industry standards of care here, where the phrase is defined by regulation.  See, e.g., Brewster v. Maryland Sec. Comm'r, 76 Md. App. 722, 728-729 (1988); Johnson-Bowles Co. v. Division of Sec. of the Dep't of Commerce of Utah, 829 P.2d 101, 112 (Utah Ct. App. 1992).

[28] We disagree that the phrase "in the securities, commodities[,] or insurance business" suggests a Legislative intent to circumscribe the Secretary's authority to then-existing industry norms.  Rather, the phrase specifies the relevant context to which the provision applies -- namely, "in the securities, commodities[,] or insurance business," and not in other types of businesses, as the drafters of the provision explained.  See L. Loss, Commentary on the Uniform Securities Act, draftsmen's commentary to § 204, at 32 (1976) (phrase "limited to dishonest and unethical practices in the securities business," not in "the myriad forms of business generally in which an applicant may have engaged").  See also Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 50-53, 56 (2004) (citing drafters' commentary as persuasive authority).

record.  See Goldberg, 444 Mass. at 633-634 (State agency has "considerable leeway in interpreting a statute it is charged with enforcing, unless a statute unambiguously bars the agency's approach" [quotation and citation omitted]).

ii.  Policy of uniformity.  Robinhood next asserts that the fiduciary duty rule cannot be reconciled with G. L. c. 110A, § 415, which provides that MUSA "shall be so construed as to effectuate its general purpose to make uniform the law of those [S]tates which enact it and to coordinate the interpretation and administration of this chapter with the related [F]ederal regulation."  We already have rejected the argument that this provision "mandate[s] that [State] courts adopt the interpretation of comparable Federal [and State] securities statutes," see Hays v. Ellrich, 471 Mass. 592, 605, cert. denied, 577 U.S. 985 (2015); we see no reason why it would require the Secretary to do so in this context -- a point confirmed by the provision's drafters.  See L. Loss, Commentary on the Uniform Securities Act, draftsmen's commentary to § 415, at 165 (1976) (§ 415 was not intended to mean "that a [S]tate court or Administrator is required to follow a judicial or

administrative precedent set by another [S]tate or by the SEC").[29]

Nor does G. L. c. 110A, § 412 (b), support Robinhood's position. It states that the Secretary "may cooperate with the securities administrators of the other [S]tates and the [SEC]" when "prescribing rules and forms," "with a view to effectuating the policy of this statute to achieve maximum uniformity in the form and content of registration statements, applications, and reports wherever practicable" (emphasis added). G. L. c. 110A, § 412 (b). The plain text does not require uniformity in the Secretary's determination of substantive policy.[30]

At bottom, Robinhood's arguments "reduce[] to the proposition that, had it been charged with enforcing [MUSA], [it] would have chosen a different regulatory approach,"

---

[29] Robinhood's proposed construction of G. L. c. 110A, § 415, would freeze the ability to adapt to changes in the industry that require new standards of conduct. Pursuant to MUSA, the Legislature authorized the Secretary -- not the SEC or sister States' regulatory agencies -- to promulgate rules responsive to industry changes. See Ciampi v. Commissioner of Correction, 452 Mass. 162, 168 (2008) ("When the Legislature vests an agency with broad authority to effectuate the purposes of an act the validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling legislation" [quotations and citation omitted]).

[30] Even with regard to forms, registration statements, applications and reports, the requirement applies only to the extent feasible. See Black's Law Dictionary 1335 (4th rev. ed. 1968) (defining "practicable" as "performable, feasible, possible").

Goldberg, 444 Mass. at 635. But our task is not to pass judgment on the wisdom of the policy. We conclude only that the Secretary had the discretion to make that determination, and that, in view of the record of investor harm, his ability to do so falls within the authority bequeathed to him under MUSA.

c. Common law. Robinhood next argues that the fiduciary duty rule is invalid because it abrogates the common law as set forth in Patsos v. First Albany Corp., 433 Mass. 323 (2001). We disagree.

As we explained in Patsos, under the common law, a "relationship between a [broker-dealer] and a customer may be either a fiduciary or an ordinary business relationship, depending on whether the customer provides sufficient evidence to prove 'a full relation of principal and broker.'" Patsos, 433 Mass. at 331-332. The determination of the "scope of a [broker-dealer's] fiduciary duties in a particular case is a factual issue that turns on the manner in which investment decisions have been reached and transactions executed for the account." Id. at 332. We observed that where broker-dealers are entrusted with investment discretion, they "assume[] broad fiduciary obligations that extend beyond individual transactions." Id. at 333. But where the "the customer makes the investment decisions and the stockbroker merely receives and

executes a customer's orders, the relationship generally does not give rise to general fiduciary duties." Id.

In each case, the fact-intensive inquiry is guided by "two potentially competing considerations: the need to protect customers who relinquish control of their brokerage accounts, and the need to ensure that securities broker[-dealers] -- particularly those who merely execute purchase and sell orders for customers -- not become insurers of their customers' investments." Patsos, 433 Mass. at 336. We concluded that "[a]ssigning general fiduciary duties only to those stockbrokers who have the ability to, and in fact do, make most if not all of the investment decisions for their customers properly provides appropriate protection only for those customers who are particularly vulnerable to a broker's wrongful activities." Id.

Contrary to Robinhood's assertions, the fiduciary duty rule does not abrogate the common law. Instead, the rule, which has the force of law, see Borden, Inc. v. Commissioner of Pub. Health, 388 Mass. 707, 723, cert. denied sub nom. Formaldehyde Inst., Inc. v. Frechette, 464 U.S. 936, (1983), is of equal status to the common law, see Commonwealth v. Adams, 482 Mass. 514, 518 (2019). The Legislature can provide, and under MUSA has provided, protections that may extend beyond those available under the common law without abrogating the latter. In other words, the rights and protections afforded under MUSA, including

those available under the fiduciary duty rule, stand shoulder-to-shoulder with those under the common law.[31]  Thus, for example, an investor injured by a breach of a fiduciary duty may have a claim under the fact-intensive inquiry delineated in Patsos, whereas the fiduciary duty rule provides a separate and distinct regulatory tool to protect investors under MUSA.

This conclusion is not novel.  We have previously acknowledged that MUSA provides protections beyond -- without overriding -- the common law.  See, e.g., Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 457 Mass. 210, 220 (2010) (definition of term "offer" under MUSA "not limited to its common-law definition").  See also Welch v. Barach, 84 Mass. App. Ct. 113, 119-120 (2013) (MUSA misrepresentation claim does not require two elements of common-law tortious misrepresentation).[32]

---

[31] Indeed, the Legislature anticipated that MUSA's protections would go beyond the common law.  See, e.g., G. L. c. 110A, § 401 (d) (for purposes of MUSA, "fraud," "deceit," and "defraud" are "not limited to common-law deceit").

[32] The Legislature may craft statutory obligations that exceed the common law, authorizing a State official or agency to define the scope of those obligations.  For example, G. L. c. 93A "created new substantive rights by making conduct unlawful which was not unlawful under the common law," such as "[u]nfair and deceptive practices" beyond those "limited by traditional tort and contract law requirements," Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975), quoting Commonwealth v. DeCotis, 366 Mass. 234, 244 n.8 (1974), and authorized the Attorney General to enforce the new protections,

d. <u>Nondelegation doctrine</u>. Robinhood also maintains that, if MUSA permits the Secretary to promulgate the fiduciary duty rule, as we conclude it does, then MUSA impermissibly delegates legislative authority in violation of the separation of powers doctrine embodied in article 30 of the Massachusetts Declaration of Rights (art. 30).[33] Article 30 "encompasses the general principle that the Legislature cannot delegate the power to make laws." <u>Construction Indus. of Mass</u>. v. <u>Commissioner of Labor & Indus</u>., 406 Mass. 162, 171 (1989). "No formula exists for determining whether a delegation of legislative authority is 'proper,'" <u>Chelmsford Trailer Park, Inc</u>. v. <u>Chelmsford</u>, 393 Mass. 186, 190 (1984), but three considerations are relevant:

> "(1) Did the Legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or . . . sufficient guidance to

---

including by promulgating rules to define the actions that constitute "unfair or deceptive acts or practices in the conduct of any trade or commerce," <u>Slaney</u>, <u>supra</u> at 694-695 & n.7, quoting G. L. c. 93A, § 2. Likewise, G. L. c. 151B supplemented protections available to employees under the common law and authorized the Massachusetts Commission Against Discrimination to make rules to that effect. See G. L. c. 151B § 3 (5). See also <u>Green</u> v. <u>Wyman-Gordon Co</u>., 422 Mass. 551, 558 (1996) (G. L. c. 151B claims are separate from common-law claims for intentional and negligent infliction of emotional distress).

[33] Article 30 of the Massachusetts Declaration of Rights provides, in relevant part, that "[i]n the government of this [C]ommonwealth, . . . the executive shall never exercise the legislative and judicial powers, or either of them: . . . to the end it may be a government of laws and not of men."

enable it to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?"

Id. See Oracle USA, Inc. v. Commissioner of Revenue, 487 Mass. 518, 525 (2021), quoting Gundy v. United States, 139 S. Ct. 2116, 2123 (2019) ("Delegation is constitutional so long as the legislative body provides an 'intelligible principle' to direct the exercise of delegated authority"). We address each consideration in turn.

First, MUSA sets forth the Legislature's fundamental policy decision to protect investors, and more specifically to protect them from "unethical or dishonest conduct or practices," G. L. c. 110A, § 204 (a) (2) (G). Delegating the authority to define the precise conduct or practices proscribed is not tantamount to permitting the Secretary to determine fundamental policy decisions. See, e.g., Commonwealth v. Clemmey, 447 Mass. 121, 136 (2006) (Legislature's "delegation of the definitions . . . simply directed the [agency] to work out the details necessary to the implementation of the policy"). Such a delegation permissibly draws on the Secretary's expertise to adapt to the real-world context of evolving practices in the securities industry, including, as relevant here, the changes resulting from broker-dealers increasingly choosing to give investment advice and blurring the line that traditionally separated broker-dealers from investment advisers, as delineated in part

2.a, supra.  See, e.g., Clemmey, supra at 137 (delegation of power to agency to define terms used in Wetlands Protection Act agricultural exemption proper "because it ensured that the scope of the agricultural exemption would be based on the application of real-world farming practices").[34]

Second, the Secretary is not without guidance in defining the proscribed practices.  See Chelmsford Trailer Park, Inc., 393 Mass. at 190.  MUSA allows the Secretary to define such conduct and practices only "insofar as the definitions are not inconsistent with the provisions of [MUSA]," G. L. c. 110A, § 412 (a); regulations also must be "necessary or appropriate in the public interest or for the protection of investors and consistent with the purposes fairly intended by the policy and provisions of [MUSA]."  Id. § 412 (b).  These provisions provide an intelligible principle to direct the Secretary's exercise of his authority.  See, e.g., Clemmey, 447 Mass. at 137 (statute's guidance sufficient where it generally specified concern for land "owned and managed by farmers," jeopardy to "the future economic viability of our farms," and "routine and long standing

---

[34] Accord United States vs. Levoff, U.S. Dist. Ct., No. 19-cr-780 (D.N.J. Aug. 12, 2020) (SEC regulations outlawing insider trading did not violate nondelegation doctrine because Securities and Exchange Act of 1934 delegated power to SEC to enact securities regulations toward goal of "insur[ing] the maintenance of fair and honest markets in [securities] transactions" [quotation and citation omitted]).

farm operations," and was amended from "land <u>for</u> agricultural use" to "land <u>in</u> agricultural use" [emphasis added; citations omitted]); <u>Tri-Nel Mgt., Inc.</u> v. <u>Board of Health of Barnstable</u>, 433 Mass. 217, 226 (2001) (statute's guidance sufficient where it required "reasonable" regulations to "address the 'health' of the community" [citations omitted]).

Third, MUSA provides safeguards such that any abuse of discretion "can be controlled," see <u>Chelmsford Trailer Park, Inc.</u>, 393 Mass. at 190. Before promulgating regulations, the Secretary must make findings that any rule promulgated pursuant to MUSA is "necessary or appropriate in the public interest or for the protection of investors and consistent with the purposes fairly intended by the policy and provisions of [MUSA]." G. L. c. 110A, § 412 (<u>b</u>). Entities subject to an administrative action are entitled to notice and a hearing, G. L. c. 110A, § 305 (<u>b</u>), and may obtain judicial review of such actions, see G. L. c. 30A, § 14; G. L. c. 110A, § 411 (<u>a</u>).[35] See <u>Clemmey</u>, 447

---

[35] Robinhood mistakenly contends that permitting the Secretary to define "unethical or dishonest conduct or practices," G. L. c. 110A, § 204 (<u>a</u>) (2) (G), by reference to the fiduciary duty rule, presents due process concerns in that it renders MUSA "so standardless that it invites arbitrary enforcement" (citation omitted), <u>Beckles</u> v. <u>United States</u>, 580 U.S. 256, 262 (2017). "A law is void for vagueness if persons of common intelligence must necessarily guess at its meaning and differ as to its application . . . or if it subjects people to an unascertainable standard" (citation omitted). <u>Commonwealth</u> v. <u>Cassidy</u>, 479 Mass. 527, 538, cert. denied, 139 S. Ct. 276

Mass. at 138 ("the availability of judicial review" weighs in
favor of conclusion that law "sufficiently demarcate[s] the
boundaries of regulatory discretion" [citation omitted]).[36]

e. Conflict preemption. Robinhood alternatively argues
that the fiduciary duty rule is invalid under the doctrine of
conflict preemption, contending that the rule "stands as an
obstacle to the accomplishment and execution of the full
purposes and objectives of [the Federal government]," Marsh v.
Massachusetts Coastal R.R., 492 Mass. 641, 648 n.18 (2023),
quoting Sprietsma v. Mercury Marine, 537 U.S. 51, 64 (2002), as
those purposes and objectives are set forth in the SEC's
Regulation Best Interest. See Merck Sharp & Dohme Corp. v.
Albrecht, 139 S. Ct. 1668, 1679 (2019) (Federal regulation
issued pursuant to statutorily delegated authority can preempt
State law). Robinhood asserts that the SEC intended the
Regulation Best Interest to set a ceiling on broker-dealers'

---

(2018). Tellingly, the fiduciary duty rule essentially imposes
obligations already well understood by investment advisers. See
Section 913 study, supra at vi-vii (investment advisers are
subject to duties of loyalty and care).

[36] Our decision in Clemmey, 447 Mass. at 135-136, disposes
of Robinhood's concern that the Secretary's interpretation vests
him with the effective "authority to establish new crimes," see
G. L. c. 110A, § 409 (a). As we explained, the Legislature may,
with sufficient guardrails, delegate to an agency the definition
of criminal conduct; such a delegation does not violate due
process where "fair notice of the conduct proscribed has been
provided," Clemmey, supra at 136, as was provided here.

fiduciary obligations to preserve retail investor access to investment options that, Robinhood predicts, may become economically unfeasible for broker-dealers to continue to offer if they must comply with the fiduciary duty rule.

i. Assumption against preemption. "[P]re-emption fundamentally is a question of congressional intent." Geier v. American Honda Motor Co., 529 U.S. 861, 884 (2000), quoting English v. General Elec. Co., 496 U.S. 72, 78 (1990). Our analysis "begins 'with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'" Dunn v. Genzyme Corp., 486 Mass. 713, 718 (2021), quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992).[37] Because State securities laws, like MUSA, fall within a field of "'traditional' [S]tate regulation," the assumption guides our analysis. Oneok, Inc. v. Learjet, Inc., 575 U.S. 373, 374 (2015).

Moreover, where, as here, "coordinate[d] [S]tate and [F]ederal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for

---

[37] This assumption reflects that "the States are independent sovereigns in our [F]ederal system," and is consistent with "the historic primacy of [S]tate regulation of matters of health and safety." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (plurality opinion).

[F]ederal pre-emption becomes a less persuasive one." New York State Dep't of Social Servs. v. Dublino, 413 U.S. 405, 421 (1973). State and Federal schemes have existed side by side since the Great Depression;[38] and Congress repeatedly has expressed its intent to preserve the States' role in regulating securities.[39] See Capital Research & Mgt. Co. v. Brown, 147 Cal. App. 4th 58, 66 (2007) ("Congress intended to preserve the [S]tates' anti-fraud authority to control the conduct of brokers and dealers"). In this context, a party asserting conflict preemption bears a heavy burden to demonstrate "evidence of conflict, and not merely with unsupported pronouncements as to [Federal] policy" (quotation and citation omitted). Roberts v. Southwestern Bell Mobile Sys., Inc., 429 Mass. 478, 491 (1999).

---

[38] "Securities regulation has existed, in one form or another, since the mid-1800s," and "[b]efore the Great Depression, securities were regulated almost exclusively by the [S]tates." Lindeen v. Securities & Exch. Comm'n, 825 F.3d 646, 648-649 (D.C. Cir. 2016). "[B]eginning with Kansas in 1911, many states imposed comprehensive securities regulation regimes . . . [k]nown as 'blue-sky' laws." Id. at 649. During the Great Depression, Congress began regulating securities at the Federal level, enacting the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, and thereafter the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp, which created the SEC. See Lindeen, supra.

[39] See, e.g., 15 U.S.C. § 77r(c)(1) (preempting State securities registration and qualification regimes for some offerings but specifying that States "retain jurisdiction . . . to investigate and bring enforcement actions, [in connection with securities or securities transactions]" with respect to "fraud or deceit" or "unlawful conduct by a broker").

See Chamber of Commerce of the U.S. v. Whiting, 563 U.S. 582, 607 (2011) ("a high threshold must be met if a [S]tate law is to be preempted for conflicting with the purposes of a [F]ederal [a]ct" [citation omitted]).  Only "affirmative evidence that Congress . . . had a ceiling-setting -- and thus obstacle-preemption-creating -- intent" will suffice.  Capron v. Office of the Attorney Gen. of Mass., 944 F.3d 9, 28 (1st Cir. 2019), cert. denied, 141 S. Ct. 150 (2020).

Here, Robinhood's preemption argument is "particularly weak" because Congress and the SEC were aware of State laws imposing fiduciary obligations on broker-dealers and declined to express an intent to preempt those laws.  See Wyeth v. Levine, 555 U.S. 555, 575 (2009) ("The case for [F]ederal preemption is particularly weak where [the Federal government] has indicated its awareness of the operation of [S]tate law in a field of [F]ederal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them" [citation omitted]).  When it enacted Dodd-Frank with the purpose "to protect consumers from abusive financial services practices," Dodd-Frank preamble, 124 Stat. at 1376, Congress instructed the SEC to look to the "legal or regulatory standards of State securities regulators and other regulators intended to protect retail customers," as models for the agency's own efforts to derive a new standard for broker-dealers.  See Dodd-

Frank § 913(c)(8), 124 Stat. at 1826. The SEC did so,[40] and in adopting the Regulation Best Interest, the SEC observed that "[s]ome [S]tates provide through statute or regulation, among other requirements . . . that broker-dealers have some form of [S]tate-specific fiduciary duty to their customers in at least some circumstances," 84 Fed. Reg. at 33,419,[41] and "courts

---

[40] See Section 913 study, supra at 91 ("many [S]tates require broker-dealers and their agents to observe high standards of commercial honor and just and equitable principles of trade in the conduct of business, and/or prohibit a variety of enumerated unethical or fraudulent practices").

[41] For example, the State of Nevada "passed a law in 2017 that imposes a fiduciary duty on broker-dealers, sales representatives, and investment advisers who give investment advice." University of Miami School of Law, Comment Letter on "Regulation Best Interest" Proposal, Nos. S7-07-18, 34-38062, and S7-08-18, 34-83063, at 8 (Aug. 2, 2018), https://www.sec.gov/comments/s7-07-18/s70718-4171732-172295.pdf [https://perma.cc/7WFL-RVTT], citing Nev. Rev. Stat. § 90.575. The Nevada Secretary of State proposed regulations pursuant to the Nevada law in January 2019 that would provide that "[a] broker-dealer or a sales representative who provides investment advice to clients, manages assets, performs discretionary trading, utilizes a title or term set forth [in the regulations, e.g., 'adviser' or 'financial planner'], or who otherwise establishes a fiduciary relationship with clients, owes a fiduciary duty to their clients." State of Nevada, Office of the Secretary of State, Notice of Draft Regulations and Request for Comment 3, 5-6 (Jan. 18, 2019). The proposed regulations have not yet been implemented. Note, Why Robinhood is Not a Fiduciary, supra at 1457 n.59.

"A number of other [S]tates have passed or [were] considering similar legislation." University of Miami School of Law, supra at 8, citing Knebel, States Look to Help Investors, With Fiduciary Rules in Flux, Bloomberg News (Feb. 7, 2018), https://news.bloomberglaw.com/legal-ethics/states-look-to-help-

interpreting [S]tate common law have imposed fiduciary obligations on broker-dealers in certain circumstances," 84 Fed. Reg. at 33,333 n.137.  See Finke & Langdon, The Impact of the Broker-Dealer Fiduciary Standard on Financial Advice, 25 J. Fin. Planning 28, 34 (July 2012) ("There are four [S]tates that apply a strict fiduciary standard [to broker-dealers and others] that apply a limited fiduciary standard").[42]

---

investors-with-fiduciary-rule-in-flux-1? [https://perma.cc/4LKC-8KBG].

[42] California, Missouri, South Carolina, and South Dakota each apply a strict fiduciary standard to broker-dealers.  See Finke & Langdon, supra at 32.  See also Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 906 F.2d 1206, 1215 (8th Cir. 1990) (South Dakota common law imposes fiduciary duties of "utmost good faith, integrity[,] and loyalty" on broker-dealers [citation omitted]); Apollo Capital Fund LLC v. Roth Capital Partners, LLC, 158 Cal. App. 4th 226, 246 (2007) ("[T]he relationship between any stockbroker and his or her customer is fiduciary in nature, imposing on the former the duty to act in the highest good faith toward the customer" [citation omitted]); State ex rel. PaineWebber, Inc. v. Voorhees, 891 S.W.2d 126, 130 (Mo. 1995) ("In Missouri, stockbrokers owe customers a fiduciary duty[, which] includes at least these obligations:  to manage the account as dictated by the customer's needs and objectives, to inform of risks in particular investments, to refrain from self-dealing, to follow order instructions, to disclose any self-interest, to stay abreast of market changes, and to explain strategies" [citation omitted]); Cowburn v. Leventis, 366 S.C. 20, 37-38 (Ct. App. 2005) ("A broker or dealer of securities is an agent of the buyer, and therefore, generally owes the buyer fiduciary duties . . . [often including the duty] to refrain from acting adversely to the buyer[']s interest, to avoid engaging in fraudulent conduct, and to communicate any information he or she may acquire that would be to the buyer[']s advantage").

In promulgating the Regulation Best Interest, the SEC "recognize[d] that there is substantial variation in the sources, scope, and application of [S]tate fiduciary law." 84 Fed. Reg. at 33,435.[43] Yet the SEC declined to indicate whether, in its perspective, the Regulation Best Interest preempted State laws, as some commenters urged it to do, stating that it could not "analyze the economic effects of the possible preemption of [S]tate law at [that] point because the factors that [would] shape those judicial determinations [were] too speculative." 84 Fed. Reg. at 33,435 n.1163.

ii.  Regulation Best Interest sets a floor.  Against this backdrop, Robinhood's theory of conflict preemption is grounded

---

"States that impose a limited fiduciary duty include Delaware, Florida, Georgia, Illinois, Kansas, Louisiana, Maryland, Michigan, Ohio, Pennsylvania, Tennessee, and Texas." Finke & Langdon, supra at 33.  See, e.g., O'Malley v. Boris, 742 A.2d 845, 849 (Del. 1999) (broker-dealers have "fiduciary duties of good faith, fair dealing, and loyalty" to customers).  See also Wallace v. Hinkle N.W., Inc., 79 Or. App. 177, 181 (1985) ("A stockbroker is a fiduciary if his client trusts him to manage and control the client's account and he accepts that responsibility").

[43] The SEC acknowledged that broker-dealers in States that already imposed fiduciary standards on them might reap cost benefits with Regulation Best Interest because "they may already engage in practices under the baseline that overlap with certain requirements under [the] Regulation Best Interest," 84 Fed. Reg. at 33,435, and also that "costs and benefits that arise from obligations under Regulation Best Interest that differ from obligations under [S]tate law, such as the Conflict of Interest Obligation, will be maintained."  Id.

in the SEC's decision not to impose a uniform fiduciary duty standard, as well as the SEC's statement that

> "Regulation Best Interest . . . balances the concerns of the various commenters in a way that will best achieve the Commission's important goals of enhancing retail investor protection and decision making, <u>while preserving, to the extent possible, retail investor access (in terms of choice and cost) to differing types of investment services and products</u>" (emphasis added).

84 Fed. Reg. at 33,323. We disagree that this aspiration to preserve investor access to an array of investor services "to the extent possible" hurdles the high bar required to find conflict preemption. See <u>Kansas</u> v. <u>Garcia</u>, 140 S. Ct. 791, 801 (2020) (cautioning against "[i]nvoking some brooding [F]ederal interest" as basis for conflict preemption [citation omitted]). Indeed, although the SEC mentioned one short-lived experiment to suggest that a higher fiduciary obligation might cause broker-dealers to pass along increased costs to customers or to alter their existing offerings,[44] the SEC declined invitations to

---

[44] In particular, the Department of Labor had promulgated regulations pursuant to the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829, codified as amended at 29 U.S.C. §§ 1001 et seq. (ERISA), through which most broker-dealers would be deemed fiduciaries when they provided recommendations to retirement plan investors. 29 C.F.R. § 2510.3-21(a)(2)(iii), (d) (2017) (DOL Fiduciary Rule), repealed in part by 85 Fed. Reg. 40589 (July 7, 2020). The SEC explained that "the full effects of the DOL Fiduciary Rule were not realized as it was vacated during the transition period," stating only that "a number of industry studies indicated that, as a result of the DOL Fiduciary Rule, industry participants had already or were planning to alter services and products

assess any preemptive effects of the Regulation Best Interest on State regulations as "too speculative." 84 Fed. Reg. at 33,325 & n.61, 33,435 n.1163.

The Supreme Court's decision in Williamson v. Mazda Motor of Am., Inc., 562 U.S. 323, 332 (2011), is instructive. There, the Supreme Court considered whether a State tort claim, which would effectively require lap-and-shoulder belts in the rear middle seat of cars, was preempted because it ostensibly presented a conflict with a Federal safety regulation that, for cost-savings reasons, gave manufacturers a choice as to the type of restraint system to install in the rear seat. Id. at 326. The Court determined that the State tort action was not preempted because cost savings was not a "significant regulatory objective." Id. at 332. The Supreme Court reasoned that

> "to infer from the mere existence of such a cost-
> effectiveness judgment that the [F]ederal agency intend[ed]
> to bar States from imposing stricter standards would treat
> all such [F]ederal standards as if they were maximum
> standards, eliminating the possibility that the [F]ederal
> agency [sought] only to set forth a minimum standard
> potentially supplemented through [S]tate tort law."

---

available to retail customers." 84 Fed. Reg. at 33,322 & n.33. See id. at 33,322 n.34 ("It was widely reported that a number of firms responded to the DOL Fiduciary Rule by either requiring customers to enter into more expensive advice relationships or by passing through higher compliance costs to customers, which altered many retail customer relationships with their financial professionals").

Id. at 336.[45]

Like the hoped-for cost savings in Williamson, the SEC's wish to "preserv[e], to the extent possible, retail investor access" to a variety of investment services and products, 84

---

[45] Critically, the Supreme Court distinguished this cost-saving aspirational goal from the purposes at issue in a prior iteration of the same Federal safety regulation, which the Court had considered in Geier, a case upon which Robinhood rests its preemption argument. Williamson, 562 U.S. at 336. Geier concerned whether a State tort claim that effectively would require airbags was preempted by a Federal regulation allowing manufacturers a choice to install a variety and mix of passive restraint systems. See Geier, 529 U.S. at 881. The Federal agency had concluded that permitting a mix of devices "would help develop data on comparative effectiveness, would allow the industry time to overcome the safety problems and the high production costs associated with airbags, and would facilitate the development of alternative, cheaper, and safer passive restraint systems," and "would thereby build public confidence" through a "gradual phase-in" of passive restraint systems. Id. at 879. The resulting Federal regulation "embodie[d] the [agency's] policy judgment that safety would best be promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car." Id. at 881. The Federal policy to promote safety in vehicles would have been undermined by a State claim holding manufacturers liable for their failure to install airbags. Id. The Court in Williamson distinguished the Federal agency's determination in Geier, where the "regulation's history, the agency's contemporaneous explanation, and its consistently held interpretive views indicated that the regulation sought to maintain manufacturer choice in order to further significant regulatory objectives" (emphasis added), i.e., enhancing safety, from the agency's determination in Williamson to permit manufacturers to choose either lap or lap-and-shoulder belts for rear middle seats for cost-savings reasons. Williamson, supra at 336.

Fed. Reg. at 33,323,[46] does not preclude the Secretary from imposing a higher duty on broker-dealers that provide investment advice. As both Congress and the SEC have made clear, the central "purposes and objectives," Marsh, 492 Mass. at 648 n.18, quoting Sprietsma, 537 U.S. at 64, of Federal law as it pertains to broker-dealer standards are to improve investor protection. See Dodd-Frank preamble, 124 Stat. at 1376; 84 Fed. Reg. at 33,323. Against the backdrop of a long history of State regulations of broker-dealer standards existing alongside Federal regulations, including States imposing fiduciary duties on broker-dealers; a congressional record encouraging the SEC to consider imposing a uniform fiduciary duty standard; the Section 913 study advising the same; and the SEC's conclusion in its adopting release that a preemption analysis would be too speculative, we conclude that the Regulation Best Interest constitutes a regulatory floor that does not foreclose State regulation to more clearly protect investors. See Williamson, 562 U.S. at 335. See also Mobil Oil Corp. v. Attorney Gen., 361 Mass. 401, 410 (1972) (Federal rule was best understood as

---

[46] See, e.g., 84 Fed. Reg. 33,322 ("subject[ing] broker-dealers to a wholesale and complete application of the existing fiduciary standard under the [Investment] Advisers Act . . . would significantly reduce retail investor access to differing types of investment services and products, reduce retail investor choice in how to pay for those products and services, and increase costs for retail investors of obtaining investment recommendations").

regulatory floor to State rule without any "clear indication that the States were to be precluded from legislating in [the] area").  Robinhood has not met its high burden to demonstrate otherwise.  See Roberts, 429 Mass. at 491.

4.  Conclusion.  The Superior Court judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.[47]

So ordered.

---

[47] Because we address only the legal questions presented by the parties, we remand the case to the Superior Court for consideration of any fact-dependent issues that may remain.